UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

LaCARRIE BYER,

                         Plaintiff,                      **NOTICE OF APPEAL**

     vs.

PERIODONTAL HEALTH SPECIALISTS OF
ROCHESTER, PLLC, ROXANNE LOWENGUTH,      Case No.: 6:17-cv-6412
DDS, MARY ANN LESTER, DMD, THOMAS
ZAHAVI, DMD, and DENTAL DIVAS, LLC

                        Defendants.

         Notice is hereby given that Plaintiff, LaCarrie Byer, hereby appeals to the United States

Court of Appeals for the Second Circuit from the final judgment in favor of Defendants entered

in this action on May 7, 2020 (Doc. 30) attached hereto as Exhibit A and the Opinion and Order

of the Hon. William K. Sessions III granting Defendants' motion for summary judgment (Doc.

29) attached hereto as Exhibit B.  Plaintiff appeals from the Judgment and Opinion and Order in

its entirety.

Dated: June 3, 2020                       WOODS OVIATT GILMAN LLP


                                By:     s/: William G. Bauer
                                      William G. Bauer., Esq.
                                      *Attorneys for Plaintiff*
                                      1900 Bausch & Lomb Place
                                      Rochester, New York 14604
                                      585.987.2800
                                      wbauer@woodsoviatt.com

TO:     ABRAMS, FENSTERMAN, et al.
         Sharon P. Stiller, Esq.
         *Attorneys for Defendants*
         160 Linden Oaks, Suite E
         Rochester, New York 14625
         585.218.9999
         sstiller@abramslaw.com

# EXHIBIT A

AO 450 (Rev. 11/11)   Judgment in a Civil Action

# UNITED STATES DISTRICT COURT

### for the

Western   District of   NY

| | |
|---|---|
| LaCARRIE BYER,<br>*Plaintiff*<br>v.<br>PERIODONTAL HEALTH<br>SPECIALISTS OF ROCHESTER,<br>PLLC, ROXANNE LOWENGUTH, DDS,<br>MARY ANN LESTER, DMD, THOMAS<br>ZAHAVI, DMD, and DENTAL DIVAS, LLC,<br>*Defendant* | )<br>)<br>)<br>)<br>)<br>)    Civil Action No.    17-cv-6412 |

# JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

☐ the plaintiff *(name)* _____ recover from the defendant *(name)* _____ the amount of _____ dollars ($ _____ ), which includes prejudgment interest at the rate of _____ %, plus post judgment interest at the rate of _____ % per annum, along with costs.

☐ the plaintiff recover nothing, the action be dismissed on the merits, and the defendant *(name)* _____ recover costs from the plaintiff *(name)* _____ .

☒ other:   Defendants' motion for summary judgment  is granted. The remaining pending motions are denied as moot.
_____ .

This action was *(check one)*:

☐ tried by a jury with Judge _____ presiding, and the jury has rendered a verdict.

☐ tried by Judge _____ without a jury and the above decision was reached.

☒ decided by Judge   William K. Sessions III _____ on a motion for   summary judgment in favor of the defendants'.
_____ .

Date:   05/07/2020 _____

CLERK OF COURT

*Signature of Clerk or Deputy Clerk*

# EXHIBIT B

UNITED STATES DISTRICT COURT
FOR THE
WESTERN DISTRICT OF NEW YORK

LaCARRIE BYER,                          )
                                        )
          Plaintiff,                    )
                                        )
     v.                                 )    Case No. 6:17-cv-6412
                                        )
PERIODONTAL HEALTH                      )
SPECIALISTS OF ROCHESTER,               )
PLLC, ROXANNE LOWENGUTH, DDS,           )
MARY ANN LESTER, DMD, THOMAS            )
ZAHAVI, DMD, and DENTAL                 )
DIVAS, LLC,                             )
                                        )
          Defendants.                   )

## OPINION AND ORDER

Plaintiff LaCarrie Byer brings this action claiming discrimination on the basis of race and wage law violations. Defendants are Byer's former employer, Periodontal Health Specialists of Rochester, PLLC ("PHS"), and the professionals at PHS: Dr. Roxanne Lowenguth, DDS, Mary Ann Lester, DMD, and Thomas Zahavi, DMD.  Byer is also suing Dental Divas, LLC ("Dental Divas"), an entity owned by Dr. Lowenguth and Dr. Lester.  Byer worked at PHS for approximately 17 years, ending in November 2015.  She also worked as a contractor for Dental Divas.

Now before the Court is Defendants' motion for summary judgment on all claims.  Defendants argue that while many of Byer's claims are untimely, the undisputed facts do not support her claims of discrimination and constructive discharge.  Those facts include admissions by Byer that she was personally close to her employers, that she loved her workplace, and that she

considered PHS "her home."  Defendants further contend that
Byer's labor law claims are barred in part because they are
untimely, and because PHS and Dental Divas were separate
employers.  For the reasons set forth below, the motion for
summary judgment is **granted**.

### Factual Background

Dr. Mary Ann Lester and Dr. Roxanne Lowenguth formed PHS in
2000 to provide periodontal services in Monroe County, New York.
Dr. Thomas Zahavi joined the practice in 2009.  All three doctors
owned PHS equally.  PHS's services included laser periodontal
therapy, dental implants, crown lengthening, soft tissue grafts
and short term orthodontics.  ECF No. 27-1[1] at 2-3, ¶¶ 1-4.

Byer worked as a Dental Assistant to Dr. Lester from 1998
until she resigned from PHS in approximately 2003.  She stopped
working at PHS after she was reprimanded for an incident
involving two other employees and told to apologize.  She did not
apologize and did not show up to work the next day.  *Id.* at 3, ¶¶
5-6.  After leaving PHS, Byer worked for two other dental
professionals for a total of one year.  Upon leaving the second
job, she asked the doctors at PHS if she could return to work
there.  They agreed to let her come back, and Byer began working
at PHS again in 2005.  *Id.*, ¶¶ 7-10.

---

[1] Plaintiff's Response to Defendants' Statement of Material
Facts Not In Dispute.

After 2005, Byer worked on Dr. Lowenguth's team.  She began as a Dental Assistant, earning $18 per hour.  In 2008, she was promoted and became Dr. Lowenguth's Treatment Coordinator.  Byer retained that position as a salaried employee until her resignation in 2015.  *Id*. at 7, ¶¶ 28-30.  Her work as Treatment Coordinator included coordinating communications with referring doctors, laboratories, implant representatives, other vendors, patients, and those patients' physicians.  *Id*. at 43, ¶ 170.  At the time of her resignation, Byer was earning a salary of $57,200 per year.  Between 1998 and 2015, Byer also contracted out her services to other dentists.  *Id*. at 9-10, ¶ 42.

After 2010, Dr. Lowenguth's team included Dental Assistant Rachel Wrights, who is Caucasian, and Byer.  *Id*. at 7, ¶ 31. During Byer's tenure at PHS, the practice employed at least four or five African American employees, including Byer.  Several of those employees worked on Dr. Lowenguth's team.  *Id*. at 9, ¶ 41.

Byer was the highest paid non-professional employee at PHS, and was paid more than other Treatment Coordinators.  *Id.* at 7, ¶ 32.  There is no dispute that Dr. Lowenguth provided Byer with numerous advancement opportunities, including paying for her to attend dental conferences.  *Id.* at 8, ¶ 33.  In 2015, Dr. Lowenguth brought Byer with her to study under a renowned dentist in Toronto; an opportunity for which Byer was grateful.  *Id.*, ¶ 35.

3

Dental Divas was founded in 2007 by Dr. Lester and Dr. Lowenguth.  Dr. Zahavi was never a member of Dental Divas.  The purpose of forming Dental Divas was to purchase a CT scan machine and provide CT services to PHS patients and dentists, as well as to referring dentists in Monroe County.  The Dental Divas office was separate from PHS, with its own suite number and a separate door to the outside.  The sign on the door said "Diagnostic Imaging," and contained no reference to PHS.  *Id.* at 5, ¶¶ 15-20.

In March 2008, Byer had a part-time job at Old Navy.  Drs. Lowenguth and Lester offered her a contract position running the Dental Divas operation so that she could leave her part-time job.  *Id.* at 6, ¶¶ 21-22.  Byer generally performed work for Dental Divas on days when Dr. Lowenguth was teaching at the University of Rochester Eastman School of Dentistry.  *Id.* at 11, ¶ 44.  She set up the billing and other administrative systems; would schedule patients; performed CT scans; and arranged for referral of patients.  *Id.*, ¶ 45.  She also maintained the log book for the CT machine and coordinated necessary maintenance and software upgrades.  *Id.*, ¶¶ 45-46.  As an independent contractor, she received a 1099 form for each year she worked at Dental Divas.  *Id.* at 12, ¶ 51.

The record makes clear that Byer enjoyed a close personal relationship with Dr. Lowenguth and the Lowenguth family.  For example, when Byer was having problems with an abusive boyfriend,

4

she sought refuge at the homes of both Dr. Lowenguth and Dr. Lester. *Id.* at 18, ¶ 82.   Dr. Lowenguth's daughter referred to Byer as "Aunt" Carrie. *Id.* Byer's sons were invited to Dr. Lowenguth's daughter's birthday parties, and Byer herself was one of two PHS employees Dr. Lowenguth invited to attend her daughter's high school graduation. *Id.* at 19, 21, ¶¶ 82-83.   At Byer's request, Dr. Lowenguth gave permission for Byer's sister to be married at the Lowenguths' lake house. *Id.* at 19, ¶ 82.

Dr. Lowenguth also gave Byer expensive gifts, including a Gucci purse from Italy, UGG custom boots from New Zealand, and a Marc Jacobs bracelet. *Id.* at 21, ¶ 86.   When asked, Dr. Lowenguth gave Byer furniture, electronics, exercise equipment, and plantings from her garden. *Id.* at 22, ¶ 88.   Both Dr. Lowenguth and Dr. Lester loaned Byer money on occasion. *Id.* at 21, ¶ 84.   When asked about her employers, Byer referred to herself as a spoiled brat. *Id.* at 22, ¶ 87.   Dr. Lowenguth's favoritism toward Byer created resentment among other PHS office staff. *Id.,* ¶ 90.

Byer has acknowledged that PHS had a fun-loving atmosphere and that employees were known to joke around. ECF No. 27-2 at 217-18, 275.   The joking included having nicknames for each other. *Id.* at 217.   Byer's nicknames for Dr. Lowenguth included "My Rocko," "heifer," "boo," "chick," "sassy," and "Ms. Lady." ECF No. 27-1 at 19-20, ¶ 82.   She referred to Dr. Lester as

5

"Momma Mare" and Dr. Lester referred to Byer as her "daughter."
*Id.* at 20, ¶ 82.  Byer at times referred to herself as
"chocolate," while referring to a Caucasian co-worker as
"vanilla" and another co-worker with slightly darker skin as
"mocha."  *Id.* at 23, ¶¶ 93, 95.  Byer also referred to herself as
a "drill sergeant" and the "queen of attitude."  *Id.* at 24, ¶¶
100, 101.  She posed no objection when a personal friend referred
to her on-line as "Chocolate Diva."  *Id.* at 23, ¶ 93.  Dr.
Lowenguth was familiar with how Byer referred to herself and
others.  *Id.*, ¶ 94.

In 2013, Dr. Lowenguth brought Byer a gift from a dental
conference.  The gift was a statue of a dentist treating a child.
Both the dentist and the child were black, and the child had a
basketball.  Dr. Lowenguth had urged Byer to further her
education to become a dentist, and Byer's son was a basketball
player.  *Id.* at 33, ¶ 122.  In fact, PHS paid for Byer's dental
schooling and testing, which Byer agreed to pay back if she left
school without attaining her license.  Although Byer did not
obtain her dental certificate, PHS never required her to repay
the funds prior to her resignation.  *Id.* at 21, ¶ 85.

When Byer received the statue in 2013, she thanked Dr.
Lowenguth and sent a message stating "LOL," standing for laugh
out loud.  *Id.* at 33, ¶ 122.  Byer displayed the statue in her
work area, and took it with her when she left PHS.  *Id.*  At her

6

deposition, Byer testified that she believed the statue was discriminatory because it reminded her she was black.  ECF No. 27-2 at 243.

Byer claims that Dr. Lowenguth asked her to meet with African American patients and to "talk that talk."  Byer also alleges that she was called into an operating room and asked to "bust a move," and that Dr. Lowenguth suggested she dress as a rapper with a gold tooth for Halloween.  On two separate occasions, Dr. Lowenguth allegedly told Byer that she looked like a rapper when she wore gold chains.  In the summer of 2014, when talking about the need for professional hair styling, Dr. Lowenguth told Byer her hair looked like Buckwheat's.  Byer also claims that Dr. Lowenguth once called her "Kunta," and on another occasion created a picture depicting Byer as a wild animal.

In 2014, Byer stated that Dr. Lowenguth was "good people" and that PHS was her "home."  In January 2015 she wrote that "our bosses rock," and in early October 2015, shortly before her resignation, Byer sent an email describing PHS as an "awesome team."  ECF No. 27-1 at 19-20, ¶ 82.

After Byer had ACL surgery in July 2015, PHS allowed her to work from home and continued her salary.  *Id.* at 8, ¶ 37.  When she returned to work in August 2015, office manager Peter Burnett informed her that all employees would be required to refer to the doctors in the office by their professional names and not by

nicknames.  *Id.* at 9, ¶ 39.

Byer had decided to leave PHS sometime before October 1, 2015.  *Id.* at 24, ¶ 102.  On October 12, 2015, Dr. Lowenguth was informed of a billing mistake.  She confronted Byer about the possibility that she had mis-charged a patient, and asked her to speak with the office manager.  When Byer refused, Dr. Lowenguth escorted her to the manager's office.  *Id.* at 24-25, ¶¶ 104, 105.  While the Complaint describes Dr. Lowenguth as "accosting" Byer, it is undisputed that Dr. Lowenguth attempted to escort her by the elbow.  *Id.* at 42, ¶ 168.

On October 19, 2015, Byer gave two weeks' notice of her resignation, and offered to stay longer to help train her replacement.  *Id.* at 25, ¶ 106; ECF No. 27-2 at 170.  All three doctors asked her to stay at PHS.  ECF No. 27-1 at 26, ¶ 111.  When Dr. Lowenguth tried to persuade her to stay, Byer did not tell her she was resigning because of race discrimination.  *Id.* at 15, ¶ 67.  Byer continued to work until November 6, 2015.  *Id.* at 25, ¶ 106.

In January 2016, Byer began work at Western New York Dental as a front desk receptionist.  On her application for her current position, Byer wrote that she left PHS because she had "put in seventeen years, learned a lot and it was time to move on."  *Id.* at 13, ¶ 56.  It is undisputed that in 2018 she received a final warning from that organization.  *Id.*, ¶ 55.

8

PHS has an extensive anti-harassment and anti-discrimination policy.  The doctors at PHS also participated in anti-harassment and anti-discrimination training in conjunction with faculty positions at the University of Rochester.  *Id*. at 14, ¶¶ 60, 62. During her employment at PHS since 2005, Byer was never demoted, disciplined, or terminated.  *Id*. at 9, ¶ 40.  She has admitted that she suffers from memory problems, and has advised her medical providers of the issue.  *Id*. at 44, ¶ 179.

On August 22, 2016, Byer filed a claim with the Equal Employment Opportunity Commission (EEOC) claiming race discrimination by PHS.  *Id*. at 6, ¶ 24.  Her letter of resignation with PHS did not list any of the allegations set forth in her EEOC complaint.  *Id*. at 15, ¶ 66.  On March 28, 2017, the EEOC issued her a right to sue letter.  *Id*. at 6, ¶ 26.

Byer filed her Complaint in this Court on June 23, 2017. The Complaint alleges that during her employment at PHS, she "suffered episodes of severe and continuing and pervasive racial discrimination and thereafter, retaliation by all Defendants and most notably Lowenguth."  ECF No. 1 at 3, ¶ 18.  Those incidents allegedly included: being asked in March 2013 not to park in a certain area where other staff members were allowed to park; being told she should not be left alone in the office, as Dr. Lester claimed that office items had been disappearing; a request that she work extra hours without extra pay; asking her to "bust

a move"; sending racially insensitive cartoons throughout the office, including superimposing an Afro hair style on her natural hair; insisting that she wear a necklace that said "bitch"; comments at office lunches about providing Byer with fried chicken; ridiculing her dress and hair style, at one point comparing her to the fictional character Buckwheat and at another to "Mammy on the plantation"; asking Byer to "talk that talk" with patients of color; calling her oversensitive about racism; sending a cartoon depicting her as looking like a wild animal; calling her "Kunta"; and Dr. Lowenguth physically accosting her in October 2015.  Most of these alleged incidents are attributed to Dr. Lowenguth, and several are disputed.

The Complaint brings causes of action for discrimination under Title VII of the Civil Rights Act of 1964; retaliation in violation of Title VII; hostile work environment under New York Executive Law §§ 296(a) and 296(6); failure to pay overtime under the Fair Labor Standards Act (FLSA); and failure to pay overtime under the New York Labor Law (NYLL).

## **Discussion**

### I.   **Summary Judgment Standard**

To prevail on a motion for summary judgment, the movant must "show[] that there is no genuine dispute as to any material fact and [that it] is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S.

317, 322—23 (1986).  In determining whether the movant has met
its burden, the Court must view all facts "in the light most
favorable" to the non-moving party.  *Holcomb v. Iona Coll.*, 521
F.3d 130, 132 (2d Cir. 2008).

If the movant meets its burden, "the nonmoving party must
come forward with admissible evidence sufficient to raise a
genuine issue of fact for trial in order to avoid summary
judgment."  *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d
Cir. 2008).  "[A] party may not rely on mere speculation or
conjecture as to the true nature of the facts to overcome a
motion for summary judgment."  *Hicks v. Baines*, 593 F.3d 159, 166
(2d Cir. 2010) (citation omitted).  Rather, to survive a summary
judgment motion, the opposing party must establish a genuine
issue of fact by "citing to particular parts of materials in the
record."  Fed. R. Civ. P. 56(c)(1)(A); *see also Wright v. Goord*,
554 F.3d 255, 266 (2d Cir. 2009).  In determining whether there
are genuine issues of material fact, the Court is again "required
to resolve all ambiguities and draw all permissible factual
inferences in favor of the party against whom summary judgment is
sought."  *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012)
(quoting *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003)).

In cases that involve claims of discrimination, courts must
use "an extra measure of caution" in determining whether to grant
summary judgment "because direct evidence of discriminatory

11

intent is rare and such intent often must be inferred from circumstantial evidence found in affidavits and depositions." *Schiano v. Quality Payroll Sys., Inc.*, 445 F.3d 597, 603 (2d Cir. 2006) (citation omitted).  That said, "the salutary purposes of summary judgment—avoiding protracted, expensive and harassing trials—apply no less to discrimination cases." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000) (citation omitted).  Thus, even in the context of a discrimination case, "a plaintiff must provide more than conclusory allegations to resist a motion for summary judgment," *Holcomb*, 521 F.3d at 137; *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 101 (2d Cir. 2010), and courts may grant summary judgment against "discrimination claims in cases lacking genuine issues of material fact," *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 69 (2d Cir. 2001) (citation omitted).

## II.  Unlawful Discrimination

### A.   Title VII Claims

Defendants submit that Byer's federal discrimination claims are barred as untimely, and that even assuming timeliness the undisputed facts are insufficient to support a Title VII discrimination claim.

#### 1.   Timeliness

Byer submitted her notice of resignation on October 19, 2015.  She filed her EEOC claim over 300 days later, on August

22, 2016.[2]  Title VII requires that individuals aggrieved by acts
of discrimination file a charge with the EEOC within 180 days or,
in states like New York that have local administrative mechanisms
for pursuing discrimination claims, 300 days "after the alleged
unlawful employment practice occurred."  42 U.S.C. §
2000e-5(e)(1).  This statutory requirement is analogous to a
statute of limitations.  *Van Zant v. KLM Royal Dutch Airlines*, 80
F.3d 708, 712 (2d Cir. 1996).  Accordingly, claims filed outside
the 300-day window are time-barred.  *See Abramson v. New York
City Bd. of Educ.*, 159 F.3d 1345 (2d Cir. 1998) (holding that
plaintiff's failure to file a charge with the EEOC within 300
days rendered the claim time-barred).

Defendants contend that the time clock for an EEOC filing
commences on the date the employee provides notice of her
resignation.  Byer argues that the effective date is not the date
of notice, but rather the last day of work.  The Supreme Court
has resolved this question in favor of the Defendants.  In *Green
v. Brennan*, 136 S. Ct. 1769, 1782 (2016), decided in May of 2016,
the Supreme Court held that under Title VII "resignation triggers
the limitations period for a constructive-discharge claim," and
"an employee resigns when he gives his employer definite notice
of his intent to resign.  If an employee gives 'two weeks'

---

[2] Three hundred days before August 22, 2016 was October 27,
2015.

notice' . . . the limitations period begins to run on the day he tells his employer, not his last day at work."  Accordingly, Byer's claims under Title VII are time barred.  *See Hite v. Manor Junior Coll.*, 301 F. Supp. 3d 478, 483 (E.D. Pa. 2018) ("in *Green v. Brennan* the Supreme Court held that Title VII's 300-day period starts on the day the employee resigns and not on the date of the last discriminatory conduct); *see also* 1 Employment Discrimination Law and Litigation § 9:11 (noting that although *Green* involved federal employment, "there is little doubt that [*Green's* holding] applies to the more common situation involving the private sector where an employee normally has 300 days to file a charge of discrimination with the EEOC").

### 2.   The Merits

Defendants further argue that, even assuming a timely cause of action under Title VII, Byer's discrimination claim fails on the merits as a matter of law.  A plaintiff alleging Title VII discrimination is subject to the three-part burden-shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  *See McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006).  Under that test, a plaintiff first "bears the minimal burden of setting out a *prima facie* discrimination case."  *Id.*  If the plaintiff satisfies her burden, she "is then aided by a presumption of discrimination unless the defendant proffers a legitimate, nondiscriminatory

reason for the adverse employment action." *Id.* Finally, if the defendant proffers a legitimate, nondiscriminatory reason, "the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination." *Id.* (internal quotation marks and citations omitted).

To establish a *prima facie* discrimination case, a plaintiff must show that: (1) "[s]he belonged to a protected class," (2) "[s]he was qualified for the position," (3) "[s]he suffered an adverse employment action," and (4) "the adverse employment action occurred under circumstances giving rise to an inference of discriminatory intent." *Mathirampuzha v. Potter*, 548 F.3d 70, 78 (2d Cir. 2008) (internal quotation marks and citations omitted). Here, there is no question that Byer belonged to a protected class and was qualified for the position. While the Complaint alleges that she was constructively discharged, and that such discharge constituted an adverse employment action, Defendants submit that, as a matter of law, the conditions of her employment did not give rise to a constructive discharge claim.

"To satisfy the third element of the *prima facie* case, a discharge may consist of either the employer's actual termination of the plaintiff's employment or the existence of intolerable conditions, attributable to the employer, amounting to a 'constructive' discharge." *Green v. Town of New Haven*, 952 F.3d 394, 404 (2d Cir. 2020) (citing *Kirsch v. Fleet Street, Ltd.*, 148

15

F.3d 149, 161 (2d Cir. 1998)).  As the Second Circuit has explained, "[a] plaintiff may prove a constructive discharge by establishing that [her] employer, rather than acting directly, deliberately ma[de her] working conditions so intolerable that [she was] forced into an involuntary resignation." *Kirsch*, 148 F.3d at 161.  "[A] constructive discharge cannot be shown simply by the fact that the employee was unhappy with the nature of her assignments or criticism of her work, or where the employee found the working conditions merely difficult or unpleasant." *See Green*, 952 F.3d at 404 (quotation marks and citations omitted). "[A] plaintiff makes a *prima facie* showing of an adverse employment action if she adduces evidence from which a rational juror could infer that the employer made her working conditions, viewed as a whole, 'so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign.'" *Id.* at 405 (quoting *Kirsch*, 148 F.3d at 161).

Applying this standard at summary judgment, "[i]f any relevant facts are in dispute or subject to competing inferences as to their effects, or if there is admissible evidence from which a rational juror could infer that a reasonable employee would have felt so compelled, rejection of the constructive-discharge theory as a matter of law is impermissible." *Id.* (citing *Kirsch*, 148 F.3d at 161-62).  Nonetheless, "some cases present records so insubstantial that no rational factfinder

16

could infer that a reasonable employee in the plaintiff's shoes could have felt compelled to resign." *Id*.  This is such a case.

The Complaint alleges an array of statements and actions that were undoubtedly inappropriate, insensitive, and based on race.  Without minimizing the offensive nature of those alleged events, the Court understands that they occurred over a period of seventeen years and in the context of a uniquely familiar and familial workplace.  It is in that context that the Court must review Byer's constructive discharge claim, viewing the facts and making all reasonable inferences in her favor.

Most of the alleged misconduct originated with Dr. Lowenguth, whom Byer admits was her close friend, professional mentor, and benefactress.  Byer repeatedly expressed love and admiration for Dr. Lowenguth and the professional staff at PHS.  ECF No. 27-1 at 13, 20, ¶¶ 57, 82.  The relationship was clearly both professional and personal.  Dr. Lowenguth provided for Byer's professional education, gave her shelter from an abusive relationship, opened her vacation home for a family wedding, and showered Byer with expensive gifts.  Byer and Dr. Lowenguth used nicknames for each other, joked and teased, and exchanged humor both in the office and on-line.  Byer asked Dr. Lowenguth jokingly if she could join her on vacation, referred to herself as spoiled, and was envied by other staff members.  *Id*. at 20, 22, ¶¶ 82, 87, 90.

17

Byer's claim that her workplace was no longer tolerable is belied by her own descriptions of PHS. Specifically, Byer described PHS as "her home," and a few weeks prior to her resignation remarked at the "awesome team" with which she worked. *Id*. at 19, 20, ¶ 82. While Byer connects her departure to the billing incident in which Dr. Lowenguth compelled her to speak with the office manager, the record makes clear that Byer was contemplating leaving PHS prior to that date. Moreover, as noted above, while the Complaint describes Dr. Lowenguth's physical contact at that time as "accosting Ms. Byer in the presence of other office personnel," Byer has since admitted that Dr. Lowenguth tried to escort her by the elbow. *Id.* at 42, ¶ 168. Other allegations have been clarified as well. For example, the Complaint alleged that Byer was told to park in an adjoining lot, but Byer now concedes that all employees were given the same instruction. *Id*. at 41, ¶ 161(a).

The record also contains incidents of racially-offensive comments and jokes at Byer's expense. "[W]hether racial slurs constitute a hostile work environment typically depends upon the quantity, frequency, and severity of those slurs, considered cumulatively in order to obtain a realistic view of the work environment." *Schwapp v. Town of Avon*, 118 F.3d 106, 111 (2d Cir. 1997). Some of the allegations relate to cartoons, known as bit strips, created by Dr. Lowenguth. Dr. Lowenguth created bit

18

strips depicting several people in the office, including Dr.
Lester.  Dr. Lowenguth also embellished photographs of office
members, including Byer.  When Byer complained about the bit
strips, Dr. Lowenguth stopped including her in the depictions.
ECF No. 27-1 at 27, ¶ 117(c).

The Complaint references Dr. Lowenguth insisting that Byer
wear a necklace that said "bitch."  Discovery revealed that she
gave a Caucasian employee a similar necklace at the same time
that said "slave."  ECF No. 27-1 at 36, ¶ 150(c).  Byer also
alleges that Dr. Lowenguth made a comment about fried chicken,
altered a photograph so that Byer was depicted as having an Afro,
and once referred to Byer's hair as looking like the fictional
character Buckweat.

Byer herself contributed to the teasing, and arguably
inappropriate, atmosphere.  For example, she at times referred to
herself as "chocolate" and to a Caucasian co-worker as "vanilla."
ECF No. 27-2 at 138-141, 213.  She also referred to herself as
"chocolate" on social media, and once posted a cartoon of herself
as a character with dark skin and an Afro.  *Id.* at 210, 215-16;
ECF No. 27-1 at 24, ¶ 98.

Byer contends that the statue given to her, that of an
African American dentist treating an African American boy, was
offensive.  Doctors at PHS had encouraged her to pursue
dentistry, and brought the statue back from a conference.  Byer

displayed the statute on her desk, and took it with her after her resignation.  She kept the "bitch" necklace as well.  *Id*. at 37, ¶ 150(e).

Byer claims that her departure was precipitated in part by the billing incident in which Dr. Lowenguth "accosted" her. There is no evidence that this incident was motivated by race discrimination.  It is also undisputed that Byer was already planning to leave her job.

In sum, over a period of 17 years there was significant intra-office banter, sometimes of a racial and inappropriate nature, in which both Dr. Lowenguth and Byer participated. Throughout her time at PHS, Byer openly expressed love and respect for her employer, lauded her work team, and was given clear and open preferential treatment.  She decided to leave PHS in October 2015, prior to the alleged billing incident, provided two-weeks notice, and offered to work longer.  These facts do not present the sort of environment that a reasonable juror could find unlawful under Title VII.  *See Gorzynski*, 596 F.3d at 102 (the court must "look to the record as a whole and assess the totality of the circumstances, considering a variety of factors including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance'" (quoting *Harris*

*v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).

Byer also brings a claim of Title VII retaliation.  To establish a *prima facie* case of retaliation, she must show: "(1) that [she] participated in a protected activity, (2) that [she] suffered an adverse employment action, and (3) that there was a causal connection between [her] engaging in the protected activity and the adverse employment action."  *Rasmy v. Marriott Int'l, Inc.*, 952 F.3d 379, 391 (2d Cir. 2020) (quoting *Gorzynski*, 596 F.3d at 110).  Protected activity "refers to action taken to protest or oppose statutorily prohibited discrimination."  *Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 566 (2d Cir. 2000).  The employer must be aware of the protected activity, and must have "understood, or could reasonably have understood, that the plaintiff's opposition was directed at conduct prohibited by Title VII."  *Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.*, 136 F.3d 276, 292 (2d Cir. 1998).

As discussed previously, the undisputed record does not support Byer's claim that she suffered an adverse employment action.  She was not disciplined, demoted, or fired.  Byer resigned, and her claim of a constructive discharge fails as a matter of law.  With respect to the allegation of retaliation, the adverse employment action must be linked to the protected activity.  Here, even assuming constructive discharge, there is no indication in the record that such discharge was precipitated

21

in any way by Byer's complaints.

Defendants' motion for summary judgment on Byer's federal discrimination and retaliation claims is therefore granted as untimely and, assuming timeliness, as insufficient to proceed to a jury.

### B.  NYSHRL Claims

In addition to her federal discrimination claims, Byer seeks damages for discrimination under the New York State Human Rights Law (NYSHRL).  As with her federal claims, there is a threshold question of timeliness.  The NYSHRL has a three-year statute of limitations.  N.Y. C.P.L.R. 214(2).  Because Byer filed suit on June 23, 2017, the limitations period allows claims based on events occurring after June 23, 2014.  The only admissible incidents alleged during that time period are the embellishment of a photograph and Byer's own resignation.

Discrimination claims brought under New York law are assessed according to the same standard applied to Title VII claims.  *See Weinstock v. Columbia Univ.*, 224 F.3d 33, 42 n.1 (2d Cir. 2000); *Brennan v Metro. Opera Ass'n, Inc.*, 722 F. Supp. 2d 326, 343 (E.D.N.Y. 2010).  The same is true for state law retaliation claims.  *See Bain v. Wal-Mart Stores, Inc.*, 585 F. Supp. 2d 449, 452 (W.D.N.Y. 2008).  Applying those standards, and the associated standards for adverse employment actions and constructive discharge, the incidents within the three-year

limitations period fall far short of supporting a viable
discrimination claim.  And as discussed above, even assuming a
timely filing with respect to all of Byer's factual allegations,
no reasonable juror could find that the conditions of her
employment were so severe that she was compelled to resign.
Defendants' motion for summary judgment on Byer's state law
discrimination claims is granted.

### III. Labor Law Claims

Byer next claims that Defendants owe her overtime pay under
state and federal law.  It is undisputed that Byer was treated as
an exempt, salaried employee for PHS, and worked as an
independent contractor with Dental Divas.  Byer does not claim
that she is entitled to overtime for work she performed
exclusively for PHS, or for work performed exclusively for Dental
Divas.  Her claim is instead that all of her work hours for both
PHS and Dental Divas must be combined, and that those combined
hours entitle her to overtime pay.

#### A.   Timeliness

The FLSA has either a two-year or three-year statute of
limitations, depending upon the willfulness of the violation.  29
U.S.C. § 255(a).  Byers resigned more than two years before she
filed her Complaint.  Accordingly, she must show willfulness
within the three-year limitations period for her FLSA claim to
survive.  The Supreme Court has held that a violation is willful

if "the employer either knew or showed reckless disregard for the matter of whether its conduct was prohibited by the statute." *McLaughlin v. Richland Shoe Co.*, 486 U.S. 128, 133 (1988). "Reckless disregard" is the "failure to make adequate inquiry into whether conduct is in compliance with the [FLSA]." 5 C.F.R. § 551.104. "Mere negligence is insufficient." *Young v. Cooper Cameron Corp.*, 586 F.3d 201, 207 (2d Cir. 2009).

Under the New York labor law statute, the limitations period with respect to overtime wages is six years, regardless of willfulness. N.Y. Lab. Law §§ 663(1), (3). Therefore, the applicable time period for any state law overtime claim commenced on June 23, 2011, and claims prior to that time are barred.

**B.   The Merits**

Byer's claim for overtime pay is premised on the allegation that PHS and Dental Divas were joint employers, that she was a non-exempt employee of both, and that her combined work hours for both Dental Divas and PHS entitled her to overtime pay. *See* ECF No. 27 at 15 ("Plaintiff's testimony clearly is that she worked as much as 50-60 hours per week, for the benefit of PHS and Dental Divas and therefore, would be entitled to overtime pay."). Defendants submit that PHS and Dental Divas are separate entities and were not joint employers.

The undisputed record shows that PHS and Dental Divas are separately-owned LLCs. Dr. Zahavi, the third owner of PHS, had

no ownership interest and played no role in Dental Divas.
Although the offices of the two entities are apparently within
the same building, they have separate suite numbers and separate
entryways from the outside.  ECF No. 27-1 at 5, ¶ 19.  Byer
alleges that there is an adjoining door connecting them.  *Id*.

The two businesses have separate phones, computers, and
billing systems.  *Id*. at 17, ¶¶ 74, 78.  Byer claims that she
used PHS computers to create certain imaging because Dental Divas
did not have the computers or software necessary to do the work.
Byer also contends that her duties for Dental Divas were written
on PHS letterhead, and that the PHS office manager was
responsible for Dental Divas' billing and collections.

Byer's briefing argues that her status with PHS and Dental
Divas constituted "joint or integrated employment."  ECF No. 27
at 11.  This argument involves two similar, but not identical,
claims.  "A joint employer relationship may be found to exist
where there is sufficient evidence that the [defendant employer]
had immediate control over the other company's employees."  *NLRB
v. Solid Waste Servs., Inc.*, 38 F.3d 93, 94 (2d Cir. 1994).  A
single or integrated employer theory applies where "separate
corporations are not what they appear to be, that in truth they
are but divisions or departments of a 'single enterprise.'"  *NLRB
v. Deena Artware, Inc.*, 361 U.S. 398, 402 (1960)).

"The 'joint employer' and 'single employer' concepts are

distinct . . . [and] approach the issue of 'who is the employer' from two different viewpoints." *NLRB v. Browning-Ferris Indus. of Pennsylvania, Inc.*, 691 F.2d 1117, 1122 (3d Cir. 1982).  In a "joint employer" relationship, unlike a "single employer" relationship, "there is no single integrated enterprise." *Clinton's Ditch Co-op Co. v. NLRB*, 778 F.2d 132, 137 (2d Cir. 1985).  "A conclusion that employers are 'joint' assumes that they are separate legal entities, but that they have merely chosen to handle certain aspects of their employer-employee relationships jointly." *Id.*  Under the "single integrated enterprise" or "single employer" doctrine, courts treat distinct but closely-affiliated entities as a single employer.  *See Juarez v. 449 Rest., Inc.*, 29 F. Supp. 3d 363, 367 (S.D.N.Y. 2014).  In determining whether separate entities should be considered a single employer, "courts consider (1) interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control."  *Id.*

Here, Byer argues that PHS and Dental Divas were not separate businesses.  To support her argument, she points to physical aspects of the two entities, such as the adjoining door and the use of PHS computers to analyze CT scan date from Dental Divas.  It is clear from the record, however, that Dental Divas was an independent legal entity that maintained its own finances

and performed a unique function in performing CT scans.  While
there was overlap in ownership between PHS and Dental Divas,
there is no evidence of either common ownership or common
control.

From the perspective of employee control, there is also
little support for the argument that PHS as an entity controlled
Byer's work for Dental Divas.  For example, there is no
indication that Dr. Zahavi exercised any control over Byer's
contract work.  During the entire time that she worked for Dental
Divas, Byer's legal relationship with that entity was separate
and distinct from her regular, full-time position at PHS.

Furthermore, for FLSA purposes, there is no evidence in the
record that Defendants' alleged failure to pay overtime was
willful.  Byer's contractual arrangement with Dental Divas came
years after she had already been working as a full-time employee
for PHS, and was offered in part to relieve her of having to work
part-time elsewhere.  She worked for Dental Divas when Dr.
Lowenguth was not in the PHS office, and admittedly received 1099
forms year after year for her independent Dental Divas work.
Lacking any evidence of willfulness, Byer's claims under the FLSA
are barred by the two-year limitations period.

Byer's final argument for overtime pay is that, despite
several years as a salaried, exempt employee at PHS, she should
not have been considered legally exempt and thus should have been

27

eligible for overtime for her combined hours.  Under 29 U.S.C. §
213(a)(1), employees are exempt if they are employed in a "bona
fide" administrative capacity.  Such a capacity would involve
"office or non-manual work directly related to the management or
general business operations of the employer or the employer's
customers," and "the exercise of discretion and independent
judgment with respect to matters of significance."  29 C.F.R. §
541.200.

The parties disagree as to whether Byer's work as a
Treatment Coordinator qualified as non-exempt work.  Byer submits
that she merely helped manage patients prior to and after dental
surgery, while all decisions with respect to care, treatment and
other matters of significance were controlled by Dr. Lowenguth.
Byer explained in her deposition that she made independent
decisions with respect to patient scheduling.  ECF No. 27-2 at
313-15.

Because the FLSA is a remedial statute, its exemptions are
construed narrowly against the employer.  *See Martin v. Malcom
Pirnie, Inc.*, 949 F.2d 611, 614 (2d Cir. 1991).  Also,
characterizing job responsibilities often involves questions of
fact that are best left for a jury to consider.  *See, e.g.,
Rubery v. Buth-Na-Bodhaige, Inc.*, 470 F. Supp. 2d 273, 277
(W.D.N.Y. 2007).  In this case, however, those questions need not
be resolved, as Byer must first show a joint or integrated

28

employer in order for her combined-hours claim to survive. Because the undisputed factual record does not support such a showing, Defendants are entitled to summary judgment on Byer's claims for overtime pay.

### Conclusion

For the reasons set forth above, Defendants' motion for summary judgment (ECF No. 25) is **granted.**  The remaining pending motions (ECF Nos. 22 and 23) are **denied** as moot.

DATED at Burlington, Vermont, this 6th day of May, 2020.


<u>/s/ William K. Sessions III</u>
William K. Sessions III
District Court Judge

29